
**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th Floor*
*New York, New York 10278*

May 24, 2024

**By ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *United States v. Mamadou Diallo*, 22 CR 343 (JMF)

Dear Judge Furman,

    The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled to proceed on Thursday, May 30, 2024, at 10:00 AM. For the reasons set out below, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 120 to 150 months, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to avoid unwarranted sentence disparities among defendants, and above all to protect society from further crimes of the defendant.

    Defendant Mamadou Diallo will be the third defendant in this case to be sentenced by Your Honor. Co-Defendant Antwan Mosley was sentenced on May 14, 2024 to 120 months' imprisonment and three years' supervised release. Co-Defendant Noel Carr is scheduled to be sentenced on May 29, 2024.

## Background

### 1. Background on WashSide, a/k/a "Wash," and "Everyhing4DayDay," a/k/a "E4D"

    The defendant was a member of a violent street gang known as "WashSide" or "Wash." (Presentence Investigation Report dated Apr. 2, 2024 ("PSR") ¶ 36). Wash was based in the neighborhood in the vicinity of the intersection of Washington Avenue and East 169th Street in the Bronx from at least 2015 through 2022. (PSR ¶ 37). This neighborhood runs along its namesake Washington Avenue and encompasses the Morris Houses, a large public housing development that lies on both sides of Washington Avenue between East 169th Street and East 170th Street. (PSR ¶ 36). Members of Wash were largely current or former residents of this neighborhood who publicly professed loyalty to the neighborhood and each other through public social media posts. (PSR ¶ 36).

Members of Wash participated in numerous violent acts, including acts of violence against rival gang members and robberies, as well as transported stolen property interstate as part of a wide-ranging campaign of pillaging numerous commercial establishments stretching from New England throughout the Northeast, Mid-Atlantic, South, and Midwest, sold controlled substances, and stole credit and debit cards for the purpose of committing wire and access device fraud.  (PSR ¶ 37).

Wash consisted of a core membership that shared the common aims of protecting the territory of the gang, enriching the members of the gang through robbery, larceny, fraud, and drug trafficking, and enhancing the reputation of the gang by engaging in acts of violence against members of rival gangs.  (PSR ¶ 38).  Wash controlled the territory of its neighborhood where only its members and associates were permitted to congregate and move freely and sell drugs.  (PSR ¶ 38).  The members of Wash were expected to make money for the gang and to engage in acts of violence to protect the gang's territory and to target the members of rival gangs.  (PSR ¶ 38).  When members of Wash committed acts of violence, they gained heightened status within the gang, in that other members and associates respected the members who committed the violence more because of their acts of violence.  (PSR ¶ 38).  Additionally, members of Wash advertised the gang and glorified its criminal activities through social media posts.  (PSR ¶ 38).

In this respect, the defendant has appeared in both his own posts and in the posts of other members of Wash on social media in multiple video recordings and photographs that reflect his status as a member of Wash, often flashing large quantities of currency and brandishing firearms.  Indeed, for at least the majority of 2021, the defendant's profile image on one of his social media accounts was a still frame depicting him holding a firearm and sitting beside a large quantity of currency, as shown below to the left.  The still frame is extracted from a music video, one of multiple music videos in which the defendant is shown with others, including multiple members and associates of Wash, performing so-called "drill" rap.  In this music video, which was posted to YouTube on or about April 10, 2021, the defendant on a near constant basis brandishes a firearm and celebrates specific, gruesome acts of gun violence.  (*See* G5 Haji – Politicking) (in the context of "spinning on the ops" or members of rival gangs, the defendant describes how an associate of Wash "left bullets in [an opp's] head like a tumor" and does "no leg shots [he] aiming for medullas" or a specific part of the brain (*i.e.*, head shots)).  Against the backdrop of his own stunning record of recidivism, revisited below, in the music video, the defendant repeats the refrain "pay bail, come home," as he literally laughs and waves a firearm around in his hand in the presence of his peers.

 

In or about October 2022, in connection with the defendant's prior federal sentencing proceedings before the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, which are discussed further below, the Government provided hyperlinks to two further and illustrative examples of these music videos, which, again, feature the defendant brandishing firearms and generally celebrating gun-related violence. The music videos were previously publicly available on YouTube, but at least one appears to have been taken down in the wake of the earlier court appearance. Accordingly, the Government encloses the two music videos as Exhibit A and Exhibit B. They are titled "G5 Haji – PSA" and "Muddy x Nash x G5 Haji" and were posted to YouTube on or about November 19, 2021 and December 3, 2021, respectively.[1] For context, less than thirty days after the posting of the second music video, on December 30, 2021, the defendant participated in the gunpoint carjacking with Co-Defendant Lydell Seymore that is described below. And approximately two months after the posting of the second music video, on February 3, 2022, members of New York City Probation found a loaded firearm when they searched the defendant's bedroom. It bears emphasis that the probation officers searched the defendant's bedroom principally because they reviewed the defendant's social media posts depicting the defendant in possession of firearms, including these music videos.

Focusing on the first music video, in which the defendant pays respect to fellow members of Wash through shoutouts to their aliases, including Co-Defendant Boss Terrell (*i.e.*, "Boss") and Co-Defendant Isaiah Smith (*i.e.*, "Zay" and "Chicago"), multiple themes of relevance to these sentencing proceedings are illuminated. To be sure, the entire music video features the near-constant brandishing of firearms and celebration of gun violence and is replete with both express and coded references to the possession and use of firearms (*i.e.*, references to the defendant possessing an "extendo" or a firearm equipped with an extended magazine and "throwing hollows" or shooting hollow-point bullets). As part of the first music video's refrain, the defendant also conveys solidarity with and respect "for the guys doing time," fellow gang members who are incarcerated, whom the defendant exhorts "to stand ten toes," a common term among the members of street gangs that is used to refer to gang members who are standing tall (*i.e.*, up on all ten of their toes) and enduring with pride and resilience a period of incarceration without succumbing to the temptation to provide assistance to law enforcement. As in multiple prior points of the music video, the defendant concludes by ridiculing rival gangs ("said you want war, so why did you run, ni\*\*\*s be talking but don't got a gun") and encouraging attacks upon them ("let's slide on the opps, ni\*\*\*, let's go hunt").

---

[1] In their titles (and other respects, too), the music videos also assert the defendant's association with the Bloodhound Brims, in which both Co-Defendant Isaiah Thomas and Co-Defendant Yaurel Centeno, among other associates and members of Wash, are also members themselves. The "G5" in "G5 Haji"—"Haji" is one of the defendant's own aliases—expressly signifies the defendant's association with the Bloodhound Brims, a set of the New York Blood Brim Army ("NYBBA") that is represented by "G5" or Gulfstream V or Gulfstream 550, a luxury jet aircraft. The other sets within the NYBBA similarly use other luxury vehicles as signifiers for themselves (*i.e.*, Maybach for Mac Ballers), and thus the defendant's use of G5 is not only a claim upon his status as a Blood, but a particular set of the Bloods, one involved in extensive criminal activity throughout the metropolitan area, including regular violence.

To transition with that last point, as the defendant obviously references throughout these music videos, Wash had rival gangs, which its members referred to as "opps," and which were similarly rooted in nearby neighborhoods. (PSR ¶ 39). From 2015 to 2022, members of Wash and members of other local rival gangs would initiate violence against each other whenever and wherever they saw one another, whether in one another territory's or elsewhere. (PSR ¶ 41). The members of Wash and the rival gangs would then post on social media to brag about their shootings, taunt one another and promote their respective gangs on a regular basis.

Members of Wash armed themselves and committed multiple acts of violence against rival gang members, including multiple non-fatal shootings (PSR ¶¶ 52-55, 63-64, 70-74) a fatal shooting in which a rival gang member, Tyrone Almodovar, was shot in the head and killed on June 26, 2022 (PSR ¶¶ 42-48), a knife attack upon a rival gang member (PSR ¶ 62). In addition, the members of Wash committed many armed robberies, including an armed carjacking on December 30, 2021 in which the defendant participated, as detailed immediately below.

### 2. Diallo's Participation in the December 30, 2021 Carjacking

On December 30, 2021, together with Co-Defendant Lydell Seymore, the defendant participated in a gunpoint carjacking of a marihuana dealer. The carjacking occurred less than two blocks away from the apartment building in which both the defendant and Seymore both resided at the time, in the heart of the territory of Wash. (PSR ¶¶ 67, 69). Having lured the victim, a marihuana dealer, to their neighborhood under the pretense of ordering marihuana for delivery, the defendant and Seymore got into the victim's car, a BMW, at the arranged time. Once inside the car, the defendant acted in concert with Seymore, who possessed the firearm at all relevant times, not only to rob the victim of his drugs and his car, but also much of his clothing. In this respect, after Seymore pressed the firearm into the body of the victim in the defendant's presence, with Seymore remaining in the car and continuing to hold the victim with the drawn firearm. The victim was ordered to get out of the car, and the defendant got out of the car as well and stripped the victim of his jacket, his sweatshirt, and his belt, together with his cellphone, leaving the victim in a t-shirt and jeans in the middle of a winter night in the Bronx. (PSR ¶ 68). After parking the victim's car a short distance away, the defendant and Seymore took photographs of the stolen car, perhaps in contemplation of trying to resell it, and then walked back home, with each of them entering their building carrying different spoils of the carjacking. (PSR ¶ 69).[2]

### 3. Diallo's Participation in Other Robberies and Larcenies Outside New York City

The members and associated of Wash also robbed and stole from numerous businesses in New York and beyond, as stated above, stretching from New England throughout the Northeast, Mid-Atlantic, South, and Midwest (PSR ¶¶ 37, 56-61, 75). Particularly during the height of the pandemic in 2020 and 2021, members of Wash, including the defendant, were regularly driving out from the city and the state in small bands to steal fungible electronic goods, typically iPhones, iPads, and their accessories, from chain retailers such as Best Buy, Target, T-Mobile, and AT&T.

---

[2] With the assistance of the victim, members of the New York City Police Department located the stolen car later that same evening after the victim was able to track the car with access to a borrowed cellphone. (*See* PSR ¶ 68).

The members of these raiding parties typically just walked into a store, identified where such goods were located, and then broke them out of display cases, striking and throwing to the ground any store employees or members of the public who offered resistance, sometimes with significant violence. (PSR ¶ 75). In total, members of Wash took merchandise in excess of $250,000 from at least nineteen states, often hitting several stores on a single day and typically returning to New York City after extended campaigns to sell their raiding spoils to a small number of resellers of stolen goods with whom they worked on a collective basis. (PSR ¶ 76).

Next to Co-Defendant Isaiah Thomas and Co-Defendant Yaurel Centeno, of all the members of Wash, the defendant was the most prolific in committing these robberies and larcenies, as his criminal history alone dramatically illustrates. The defendant has been convicted of this offense conduct in cases in Pennsylvania (PSR ¶¶ 130) and New York (PSR ¶ 133) but also faces pending charges and prior or outstanding warrants (issued prior to any federal arrest and detention) for the same offense conduct in cases in New Jersey (PSR ¶ 139), Michigan (PSR ¶ 140), and Ohio (PSR ¶ 142). In addition, as disclosed through discovery, the defendant is the identified perpetrator in approximately another ten incidents that occurred in New York, New Jersey, Pennsylvania, Massachusetts, and Alabama in 2020. On still another occasion, on or about August 24, 2020, Co-Defendant Yaurel Centeno, who was detained, participated in a recorded jail call with the defendant, Co-Defendant Lydell Seymore, and another associate of Wash, during which the group discussed how the at-liberty participants in the conversation were in the midst of conducting a series of robberies at T-Mobile stores in upstate New York. Indeed, literally during the recorded jail call, the defendant and Seymore excused themselves from the conversation to go and commit one such robbery, leaving Centeno and the associate of Wash to continue discussing the resale value of certain stolen electronic goods.

In the pending case in Ohio, on which the Government has received information from the Medina County Prosecutor's Office in Medina, Ohio, the defendant is charged with robbery alongside Co-Defendant Lydell Seymore and another associate of Wash. On September 15, 2020, the defendant and his two accomplices entered a Target in Wadsworth, Ohio and stole over $5,000 of Apple AirPods, iPads, and TVs. In what was the standard modus operandi for the members of Wash, including the defendant, the defendant and the associate of Wash asked a store employee to open the locked display cabinet for the products, after which the defendant grabbed the employee and threw him back and away from the cabinet. From there, the defendant plundered the cabinet and ran out of the store. The robbery was reported immediately, and local police officers intercepted the defendant and his accomplices, leading to a high-speed chase on the highway that was abandoned because the defendant's car was travelling at such a high rate of speed that it was deemed unsafe to pursue. As authorities from multiple states, eventually with the involvement of the Government, began to investigate the offense conduct, the defendant was identified as one of the perpetrators and eventually arrested after he was taken into custody in another jurisdiction. Before his initial federal arrest on or about February 3, 2022, the defendant had warranted twice on this same case when it was scheduled for trial in May 2021 and in October 2021, on each occasion having been released after paying cash bail.

On two additional occasions, the defendant was also involved in similar high-speed chases, one of which occurred later that same day, on or about September 15, 2020 in Pennsylvania, when he was pursued by law enforcement for larcenies that the defendant had committed earlier in

Pennsylvania. (*See* PSR ¶ 131). In that case, the defendant, who was the driver, crashed the car during the flight from police officers and was apprehended on foot as he continued to flee with Seymore and the associate of Wash. (PSR ¶ 131). The other incident of flight from law enforcement occurred on or about November 22, 2021 in New York. (*See* PSR ¶ 143). The defendant was also involved in multiple other car-related crimes outside of the metropolitan area, including the grand larceny of a car in Warsaw, New York in or about May 2020. (*See* PSR ¶ 129).

### 4. Diallo's Participation in Other Criminal Activity While a Member of Wash

As made clear in the prior federal court proceedings in which the defendant was convicted and sentenced for being a felon in possession of a firearm (*see* PSR ¶ 134), the defendant was involved during the period of the offense conduct in illegal firearms possession. Indeed, based on the accounts of his co-defendants disclosed through discovery, the defendant was in possession of multiple firearms that were shared among the members of Wash on multiple occasions. For example, in a recorded jail call on or about August 3, 2020, between Co-Defendant Isaiah Thomas, who was detained, and Co-Defendant Yaurel Centeno, Centeno explained in substance and in part to Thomas that the defendant, whom Centeno referred to by his alias "Haji," was in possession of Centeno's firearm but had wasted all its ammunition by shooting at members of a rival gang.

### 5. Procedural Background

On or about December 14, 2022 a grand jury sitting in the Southern District of New York voted a superseding indictment (the "S1 Indictment") against the defendant and his ten co-defendants, charging the defendant with one count of participating in a racketeering conspiracy from at least 2015 up to and including December 2022, in violation of 18 U.S.C. § 1962(d) ("Count One"); one count of carjacking on December 30, 2021, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2119 and 2 ("Count Eighteen"); one count of robbery on December 30, 2021, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951 and 2 ("Count Nineteen"); and one count of using and carrying a firearm during and in relation to and possessing a firearm in furtherance of a crime of violence, which firearm was brandished, on December 30, 2021, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii) and 2 ("Count Twenty").

At the time of his indictment here, the defendant was in the custody of the Bureau of Prisons ("BOP") and incarcerated at the Metropolitan Detention Center ("MDC"), serving the sentence of 15 months' imprisonment that was imposed on October 14, 2022 in *United States v. Mamadou Diallo*, 22 CR 127 (JPO) following his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

On February 16, 2024, the defendant entered a change of plea before the Court to Count One of the S1 Indictment, stipulating through a plea agreement entered into on that same date to all the offense conduct with which he was charged in the S1 Indictment. (PSR ¶ 30).[3]

---

[3] To be sure, the defendant's guilty plea came more than two years after he first appeared on the S1 Indictment and just over three weeks before trial. He was the last of the eleven defendants charged in the S1 Indictment to enter a guilty plea. The timing of his guilty plea was sufficiently

In terms of the defendant's adjustment to incarceration, the Government has requested supplementary records concerning the disciplinary history reflected, at least in part, in the PSR and will supply any records received from the BOP concerning the defendant's period of incarcerations since on or about February 3, 2022 at the MDC.

In terms of the defendant's criminal history, the Government relies upon the recitation of the criminal history in the PSR, some of which is described in the preceding paragraphs. (*See* PSR ¶¶ 125-154).[4]

## Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

---

far in advance of trial, albeit by a matter of days, to earn the additional one-level reduction under U.S.S.G. § 3E1.1(b). Ordinarily, such a record would deserve no comment, but here the defendant's suggestion that he was prepared to enter a guilty plea from the outset (and implicitly deserves some consideration for that purported willingness) is very plainly belied by the record. (*See* Def.'s Ltr. at 2).

[4] Respectfully, we disagree with the contention that the defendant's criminal history category overstates his criminal history, let alone to a degree that would even approach grounds for a departure, as the defendant contends. (*See* Def.'s Ltr. at 3). If anything, insofar as he successfully warranted in multiple pending cases, the defendant's criminal history understates where his criminal history category would lie now at the time of sentencing, but for his malfeasance.

  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

  While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### **Sentence**

  The Government respectfully submits that a Guidelines sentence, which is a substantial sentence, is warranted given the seriousness of the offense conduct and the need to provide just punishment. For years, the defendant chose to participate in a life of crime with a violent neighborhood street gang and did so with full knowledge that his fellow members were involved in all manner of violence that terrorized their local communities. In the case of the defendant, like some but not all of his co-defendants, he also succeeded in terrorizing other, distant communities, literally across a swath of this large country from Michigan to Massachusetts, Alabama to Ohio. This expansive crime spree was committed together with his fellow gang members and their associates, who functioned as raiding parties, setting off from New York City and pillaging what other members of Wash expressly discussed were less hardened targets in suburban and rural areas that were selected for this reason. As we have stated in connection with the sentencing of Co-Defendant Isaiah Thomas, the defendant, too, and his fellow gang members chose to attack these far-flung communities amidst the most serious disruption of public life in the recent history of this country because they correctly sensed that the collective guard of their victims was down, law enforcement was preoccupied and limited in its ability to respond, and the consequences of being caught would not prove severe.

  Against this backdrop, back in New York City, the defendant also participated in a serious act of violence, which easily could have resulted in the death of the victim of the carjacking, a planned ambush of a kind in which a victim drug trafficker often resists and harm to life, even loss to life, is frequent. It was a brazen robbery that the defendant committed with another member of Wash for limited possible returns, reflecting an alarming willingness on the part of the defendant to engage in serious violence for little real purpose, however dastardly that purpose. As we have said with respect to other co-defendants and will repeat again, as appropriate, the fact that the defendant not only participated in this serious violence, but did so in connection with his ongoing

association with a violent gang, further escalates the seriousness and dangerousness of the defendant's actions, again, like those of his involved co-defendants.

It is also relevant, in light of the many additional acts of violence that his fellow gang members perpetrated in the territory of Wash and certain adjacent neighborhoods in the Bronx, all of which the defendant had awareness of through his intense and ongoing relationship with his fellow gang members, that the defendant performed, produced, and disseminated music videos in which he celebrated and indeed glamorized and encouraged a culture of gun violence. The actual, real-world gun violence, committed with real guns of the kind that the defendant possessed, of course is anything but glamorous. It consumes the lives of its perpetrators, like the defendant, but more to the point the lives of many, many others, completely innocent, good, hard-working people whose communities are made dangerous and depressing places to live because of criminal enterprises, because of gangs like Wash. At bottom, it angers the heart to watch the defendant exuberantly sing to the world about his fellow gang members shooting people in the head in a music video posted in or about November 2021, when he knows that his fellow gang members committed that same, heinous crime just over one year earlier, and, perhaps more important, when in the ensuing days he will both have committed a gunpoint carjacking and possessed an operable and loaded firearm in his bedroom in the middle of the territory of Wash. The defendant is not a victim of our society's cultural problem with celebrating gun violence; to the contrary, he is responsible for driving, sustaining, and popularizing that culture. When he sings about possessing and using guns against "the opps," his lyrics carry credibility and outsize ability to influence because it is known within the community that what he describes himself and his fellow gang members as doing, they actually did.

In this same vein, a Guidelines sentence is also necessary to ensure general and specific deterrence and promote respect for the law. As stated previously on multiple occasions in connection with sentencing in this case, for years, members of Wash chose to live according to their own code of conduct and with a total disregard for the law. For years, the defendant's daily existence was antithetical to a law-abiding life, choosing, like his co-defendants, his allegiance to his fellow gang members over any regard for the law or the other members of his community, who were exposed to regular risks of violence, and others in faraway places whose lives were briefly but violented disrupted in a manner that was shocking and deeply upsetting. As previously reported to the Court, the accounts of the employees and members of the public who witnessed and who were assaulted during the robberies and larcenies outside of New York City are a repeated chorus of shock, dismay, and violation. In short, the need for deterrence is particularly strong in cases like this one, where the defendant and his fellow co-conspirators built their entire lives around violence or the threat of violence and other illegal conduct. It bears further emphasis in conceiving of the deterrent message that the sentence here must accomplish that the defendant brags to the thousands who have watched his music videos that he and his fellow gang members embrace the penal consequences for their criminal activity, standing tall without ever wavering or regretting their choice to live outside the law. It is time now for the Court to deliver through a substantial, indeed a severe sentence the life-altering consequences for which the defendant claimed he and his confederates were prepared and to show to all the young men and women who might have been influenced by the defendant's delusional portrayal of those consequences the reality of what awaits them if they choose as poorly as the defendant.

In the defendant's case, like that of some of his co-defendants, such as Co-Defendant Isaiah Thomas, there is also a very troubling aspect of the record that requires a sentence able to achieve what we have described previously as the hardest edge of deterrence and the protection of the public. Although to a lesser degree than Thomas, the defendant nonetheless possesses a demonstrated record of repeatedly committing serious crimes almost immediately after being arrested for those same serious crimes. It is remarkable and damning that in December 2021 and February 2022, when subject to probation, that the defendant is committing such serious firearms-related crimes. At a minimum, the defendant was arrested at least fifteen times in 2020 and 2021, convicted of multiple misdemeanors and one felony during that same time period, and yet none of it appeared to have any impact whatsoever upon him. Far from being chastised by any of those experiences, the defendant, as his music videos make clear, held the criminal justice system in derisive contempt. The defendant has shown the public as much as this Court how he responded to the opportunity for reflection that these repeated brushes with the law offered, including the experience of being incarcerated for multiple weeks, and he has shown powerfully that he not only failed to learn any lesson, he does not even seem aware of or interested in the lesson being offered. The defendant may now be sorry, but it is clear he is sorry for having to face finally the very serious consequences for what he did, not for what he did itself.

In mitigation, the defendant appeals to the conditions of his confinement, which the Government will address on the record with the full record of the defendant's disciplinary history before the parties and the Court, which is one part, albeit just one part, of considering what impact, if any, the period of a defendant's pre-sentencing incarceration should have upon the sentence imposed.

Finally, any argument from the defendant here that he is a product of some combination of difficult circumstances obscures the real tragedy of the defendant's upbringing, namely his very consistent effort to squander the opportunity that his immigrant family attempted to earn for him by lawfully coming to this county. (*See* Def.'s Ltr. at 5). And as the Government has repeated and will continue to repeat in connection with sentencing in this case, where appropriate, any argument in this space also ignores the fact that the overwhelming majority of citizens who are raised in the South Bronx face many of the same conditions and challenges as the defendant, if not worse, and yet inspirationally choose to live honest, law-abiding lives from the outset of their young adulthood, attending school and working to maintain lawful employment in the hope of improving their own lives and those of their families. But the defendant here made choices day after day to involve himself with a violent gang and to make his money by stealing from people who were trying to live honest, law-abiding lives. The defendant must answer for it now.

## Victims

At this time, among the many victims of the defendant and his co-defendants, the Government does not anticipate that any identified victims will participate in-person at the sentencing, including the victim of the gunpoint carjacking on December 30, 2021. If that changes, then the Government will provide immediate notice to counsel for the defendant and the Court.

### Restitution

      As the Government has previously stated in connection with this case, the Government is acutely conscious of its responsibility not only to the public but also to the specific victims of crimes, particularly violent crimes, at the time of sentencing. The Government continues to work to make productive contact with the victim of the carjacking on December 30, 2021, for multiple reasons, including to ascertain any appropriate restitution. Regardless of whether the Government is successful in doing so before sentencing, given its statutory obligation for victims to receive any appropriate restitution under the law, the Government respectfully requests that the Court set August 28, 2024 as the date for the final determination of any victims' losses pursuant to 18 U.S.C. § 3664(d)(5). In addition, on or before that date, the Government will seek restitution on behalf of multiple additional victims, including multiple companies from whom the defendant himself stole merchandise, including Apple and Target.

### Conclusion

      For the reasons set out above, the Government respectfully requests that the Court impose a Guidelines sentence of imprisonment of between 120 to 150 months upon the defendant in order to reflect the seriousness of the offense, promote respect for the law, ensure adequate specific and general deterrence, and protect the public. Given the extended duration of the offense conduct and the defendant's demonstrated recidivism, the Government respectfully requests that the Court further impose a sentence of supervised release of three years, the statutory maximum, to provide every possible incentive for the defendant's eventual successful integration into society and rehabilitation.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By: *Thomas John Wright*
Courtney L. Heavey
Thomas John Wright
Assistant United States Attorneys
(212) 637-2413 / 2295

cc: Mark DeMarco (Counsel to Defendant Mamadou Diallo) (by ECF)